(87 Misc. Rep. 541)

### In re BROWN.

### In re McLEAN'S WILL.

(Surrogate's Court, Saratoga County.   November, 1914.)

1. ATTORNEY AND CLIENT (§ 140*)—COMPENSATION—IMPLIED CONTRACT.

In the absence of any stipulated price to be paid for services performed by an attorney, there is an implied promise on the part of the client to pay whatever the services are reasonably worth.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 336–349;  Dec. Dig. § 140.*]

2. ATTORNEY AND CLIENT (§ 141*)—COMPENSATION—AMOUNT—WILLS.

Where there was a large amount of property involved, a fee of $100 each for drawing several wills, and $50 for drawing a codicil, was not unreasonable.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 347;  Dec. Dig. § 141.*]

3. ATTORNEY AND CLIENT (§ 166*)—CONSULTATION FEES—SUFFICIENCY OF EVIDENCE.

Evidence in support of an attorney's claim against an estate for consultation fees *held* to show that a charge of $15 per week for the consultations was not unreasonable.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 368–372;  Dec. Dig. § 166.*]

4. ATTORNEY AND CLIENT (§ 140*) — COMPENSATION — REASONABLENESS — DETERMINATION.

In determining the compensation to which attorneys were entitled for legal services in connection with the management of an estate, the magnitude of the client's interest involved and the fact that the estate was managed so that there was a gain, in addition to interest, were matters proper to be considered.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 336–349;  Dec. Dig. § 140.*]

Proceedings upon the judicial settlement of the account of Frank H. Brown, as executor of the last will and testament of Frances L. McLean, deceased.   Decreed according to opinion.

Frank H. Brown, of Ballston (Edgar T. Brackett and Hiram C. Todd, both of Saratoga Springs, of counsel), for executor.

Miller & Golden, of Schenectady, for Nellie B. Andrews, Frances McL. Beecher, and Clara Horton Beecher.

### Matter of Scott & Brown Claim.

OSTRANDER, S.   A claim for services was presented to the executor by Frank H. Brown, as surviving partner of Scott & Brown, attorneys for deceased.   Said Brown being the executor, this claim comes on for proof upon the judicial settlement of his accounts.   Deceased was an elderly lady, an aunt of James L. Scott, one of the firm of Scott & Brown.   Prior to January 8, 1904, this firm acted as her attorneys, having general charge of her business, investments, and affairs.   Her estate then consisted of real and personal property of the value of about $37,403.36.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

On January 8, 1904, she wrote Mr. Scott that it was nearly seven years since he took charge of her business; that he had done splendidly for her, and she wanted him to be well paid, and wished to give him something for his kindness; that she wanted him to take a note for $5,000 and interest ($5,250) which she held against him for the firm's legal services to that time; that she had willed Scott $20,000, which he could take then as his own, in payment of the legacy, but that in case she got only one-thirteenth, instead of one-seventh, of the estate of Frank Thompson, a deceased relative, Scott should repay the $20,000, and that this would settle all matters between them.

[1] In January, 1904, Mrs. McLean received as her share one-seventh of the Thompson estate, $143,550.67, consisting of various railroad stocks, bonds, and other securities, thus leaving her property in January, 1904, about $155,000 of real estate, stocks, bonds, mortgages, etc. For eight years from January, 1904, until the death of Mr. Scott, January 9, 1912, her business and estate was managed by the firm as her attorneys. During this time no payments for services were made: There is not only an implied promise to pay for these services, but also the evident intention of Mrs. McLean, as gathered from her letter, to pay for what should be done for her by the firm. In the absence of any stipulated price, the implied promise is to pay whatever the services were reasonably worth. The claimants allege that such services were worth $23,064.99, or approximately $2,883 per year.

[2] Claimant's bill of particulars classifies the items of the claim approximately as follows: Accountings for each year, except 1904, are charged at $500 per year, and for 1904 at $900. Consultations, 52 weeks in each year, are charged at $15 per week, or $780 per year. In 1904, drawing two wills is charged at $200. In 1905, 1906, 1907, and 1909, drawing a will in each year is charged at $100 each. In 1908, drawing a codicil to her will is charged at $50. In each year for procuring investments is a charge equal to 1 per cent. of the amount for which investments are claimed to have been made in such year; also a charge for care of the entire estate, in each year, equal to approximately $45/100$ of 1 per cent. on the total amount of the estate in their charge. These charges were: For the years 1905, 1906, and 1909, $810 each; for the years 1910 and 1911, $910 each; for 1904, $888.76; for 1907, $809.99; for 1908, $830, or approximately $70 per month.

[3] Considering these various items separately:

The testimony as to the consultations may be briefly summarized as follows:

Miss Hatton, Judge Scott's stenographer at the Saratoga office, says that he went very often from Saratoga to Ballston to see Mrs. McLean, and had conversations with her at her residence.

Miss Cahill, stenographer at the Ballston office, 1910 and 1911, says that Mrs. McLean's housekeeper sometimes telephoned the office, asking that Mr. Brown come to her house, as she wanted to see him. Witness could not tell how often these calls came, but thinks they came frequently.

Amy E. Smith, Mrs. McLean's secretary and housekeeper, lived with her about seven years prior to her death. She says Scott came to Mrs. McLean's sometimes two or three times a week, sometimes oftener. She often telephoned him at Mrs. McLean's request to come. These visits continued until near the last. She thinks some of the visits were both social and business. He often brought legal papers.

Mr. Van Voast, one of the contestant's witnesses, testified that such consultations might be worth $3 to $5 each. I think the charge of $15 per week for such consultations is not unreasonable and is justified by the evidence.

There is little evidence applying specifically and separately to the value of drawing the different wills. Mr. Smith, one of the contestant's witnesses, placed a valuation of $100 upon drawing a will involving this estate. Mr. Van Voast, another of contestant's witnesses, placed the value at $25.

In view of the magnitude of the interests involved and the responsibility assumed, the charges for the preparation of the wills were not unreasonable.

Coming now to the matter of making investments and care of the estate.

Miss Hatton, Judge Scott's stenographer from 1906 to 1910, narrates in a general way something of Scott's services during that period. She saw him having numerous conversations with parties coming in to pay interest on mortgages, making entries in the books, correspondence with various persons, including Mrs. McLean. Her business was one of the chief items of his business; he spent a great deal of time on it—a part of each day. He personally kept the securities—collected the interest, paid over the money.

Miss Cahill, stenographer at the Ballston office, 1910 to 1912, saw persons at the office from time to time talking with Mr. Brown in reference to Mrs. McLean's affairs—they came to pay interest, talked about loans, borrowing money. Brown loaned large amounts of the money on bonds and mortgages to various people. He drew other papers in connection with her business, and corresponded concerning it, almost every day; week in and week out, during all the time she was there, people were going and coming to see Mr. Brown in reference to Mrs. McLean's business. Mr. Scott was there one or two days a week and met people with reference to her business. Scott & Brown frequently conversed over the 'phone in reference to her business.

Judgment rolls in several actions by Mrs. McLean against various defendants, in which Scott & Brown appeared as her attorneys, were put in evidence.

The books kept in reference to the estate by Mr. Scott and Mr. Brown show many entries, concededly in their handwriting, indicating activity in connection with Mrs. McLean's affairs by way of investments, collections, payments to her, and other details of management. It is not disputed that the whole estate was fairly accounted for. The income by way of interest and rentals, with increase of principal from January, 1904, to 1912, amounted to about $77,854.11. The amount of new investments in various years were: 1904, $89,396; 1905, $65,904;

1906, $57,085; 1907, $42,766; 1908, $75,456; 1909, $62,661; 1910, $46,182; 1911, $60,171.

A very wide difference of opinion marks the testimony of the witnesses for the claimant and the contestants concerning the value of the services rendered.

For the claimants:

Judge Salisbury gave the value of the whole services, including the consultations and the wills, at $3,500 per year. Gen. Lester placed the value at $3,000 per year, and Judge Rockwood at $3,000 to $3,500 per year, an average of about $3,166. Deducting the claims made in the bill of particulars (yearly, for consultations, $780; preparing wills, $100, and preparing accountings, $500, an aggregate of $1,380) we should have for the investment and care of the estate approximately $1,786 per year. The amounts charged average about $1,475 per year for these services.

For the contestants:

Mr. Van Voast, answering the contestant's hypothetical question, appraised all the services performed at nothing. He gave as his reason, principally, that lawyers handling this estate should be able to get enough out of commissions paid by borrowers and work done for them to pay for their services. I am not much impressed by this rule for compensation. He testified that, if the lawyer received nothing from the borrower, then 5 per cent. on the income would be sufficient, without anything for investing or handling the principal or other services in connection with it.

[4] Mr. Landon, answering contestants' hypothetical question, thought that the value of the services under the circumstances assumed was nothing. He also testified that if legal services were properly rendered, with fair skill and to the advantage of the client, they are worth something; that the responsibility imposed upon the lawyers with the magnitude of the interests involved is a material element in determining the value; also that in reaching the value of such services the fact that the estate had been so managed that there had been no loss, but some gain, in addition to interest, would be material. He thought that the lawyers had no right to loan to companies in which they were interested, even if there were no loss, but conceded that if the client were competent to judge the investment and was satisfied, and not influenced by the lawyers, the lawyers would be within their rights in making the investments. He thought that loans to the storage company of which the lawyer was president, and which was entirely solvent, even though directed by the client and resulting in no loss, and though the loan was secured by collateral such as banks loan on all over the country, was such an abuse of his trust as made the service of no value.

The fact that the client had long been a large stockholder in the storage company does not seem to have been brought to the attention of either Mr. Van Voast or Mr. Landon.

Mr. Smith, answering the hypothetical question put for the contestant, said the services were worth nothing. He put this answer upon the ground that the services were not faithfully rendered, but were more for the benefit of the lawyer than the client. Cross-examined,

he said that if services were properly rendered they implied a value, and would be worth just as much rendered by one person as another, relative or not, and regardless of gifts made to the lawyer by the client out of love and affection. If none of the money had been loaned to a member of the firm or family, or any corporation in which the lawyer was interested, he would fix the compensation at 5 per cent. of the income, besides expenses. If loans had been made to the corporation, and the client, being competent, approved, and had received better interest than she could have gotten elsewhere, and was herself a stockholder in the corporation, and loans had been made on collateral accepted by banks, he would think the loans justifiable.

It is nowhere suggested that Mrs. McLean was not competent. Exhibit No. 29, a holographic will, prepared by her, and also her letters in evidence, indicate a clear head and good mental balance.

It may be instructive to review her own attitude towards the management of her property and the value of the services.

In her holographic will, dated July 8, 1907, by the eighth paragraph she gave to Mr. Scott a legacy of $10,000, and in the twenty-fifth paragraph thereof, she says:

"The foregoing bequest to my nephew James L. Scott is in addition to the sum of twenty thousand dollars ($20,000) given to him in January, 1904, and also in addition to the sum of five thousand dollars ($5,000) paid by me to him in January, 1904, for his legal services rendered to me to that date, and said previous gifts and the bequest herein contained are all in grateful recognition of his care and attention to my interests in preserving my estate and his continued fidelity to me for many years both before and since I inherited from my nephew Frank Thompson, and I hereby expressly ratify and confirm all that my said nephew James L. Scott has done for me and with my estate and property interests, he having been faithful and zealous and active in my behalf."

By her will (Exhibit No. 24), dated January 11, 1909, she gives to Mr. Scott $5,000, and after naming him as her sole executor and testamentary trustee she uses the following language:

"I hereby expressly ratify and confirm all that my said nephew has done for me and with my estate and property interests."

By her will (Exhibit No. 22), dated July 26, 1909, after giving to divers persons bequests of money amounting to about $86,500, and to another legatee the life use of her real estate in Schenectady, she devised one-half of the residue of her estate to her nephew James L. Scott. The share of the residue so bequeathed was at least $50,000.

By a codicil to her will (Exhibit No. 26), dated February 11, 1911, after making some slight changes in her will, she confirms each and every part of her said will bearing date July 26, 1909.

It thus appears that the management of the estate was satisfactory to her, and that up to at least a year before his death she approved of all his acts in managing the estate, and that in addition to her former gifts she had willingly paid upwards of $700 a year for his management of her smaller estate, then amounting to about $37,000, or about one-fifth of her estate in later years.

In view of all the circumstances, I cannot agree with the view of the contestant's witnesses that the services were of no value, and I think

the claims for investing and caring for the estate should be allowed as charged in the bill of particulars, except as hereinafter stated.

Coming to the items claimed for accountings—$900 for the year 1904 and $500 for each year thereafter: These so-called accountings appear to consist of statements of the condition of the estate at divers times, principally an enumeration of the properties of the estate, supplemented at times by transcripts of cash in the hands of the attorneys, receipts and disbursements in some detail. These services are so closely related to the management and care of the property, and appear to have involved so little trouble and expense, that no separate charge should be allowed for them.

The foregoing discussion of the Scott & Brown claim has related to various items of the claim, extending over the whole period covered by the claim. But a portion of the claim accrued more than six years prior to presentation thereof, and such portion is barred by the statute of limitations and should be disallowed, notwithstanding any prior general statements herein in reference to allowance of items extending over the period in question.

### In the Matter of the Claim of Frank H. Brown.

Following the death of Judge Scott, Mr. Brown had charge of the estate for Mrs. McLean from January, 1912, until her death in February, 1913. During that time he had general charge of the estate, reinvested about $26,702.62 thereof at 6 per cent., and drew her last will and a codicil thereto, consulted with her at her home at least three times per week about her matters, foreclosed several mortgages, represented her successfully in a litigation concerning a trust deed securing to her claims to the amount of about $35,000. He rendered to her four statements of the condition of the estate and performed other services mentioned in his bill of particulars.

For these various services he claims $3,690. His expert witnesses estimated the value of the services: Judge Salisbury, $5,500; Gen. Lester, $4,500 to $5,000. Judge Rockwood placed the value of the legal services at $3,000, and the litigation concerning the trust deeds at $2,000, an average of about $5,000 each.

Contestant's witnesses gave the value as follows: Mr. Van Voast' thought the consultations worth $3 to $5 each, and the drawing of the will $25, and the other services 5 per cent. of the income. Mr. Landon thought 5 per cent. of the income a sufficient charge for all the services. Mr. Smith allowed 5 per cent. of the income, plus $300 for the' litigation and $100 for the will.

In view of all the testimony and after careful examination of the exhibits, I think the claim should be allowed, except the item of $800 for accountings, which should be disallowed.

Decreed accordingly.